All right, your honors, I'm Angela Aliotto and I represent the plaintiff in this case against, the appellant in this case against Lucasfilms. I think going right at the issues of this case, it's really important to start out with a chronology. My client started working for Lucasfilm in 2004 and from 2004 to the day that she was terminated, she has a stellar performance review. She had never been written up from 2004 to 2009, the day that she had been terminated. In the summer of 2008, she was spoken to by her supervisor, a guy named Casey, and he met her in a bar and told her that, told her two things. Number one, people are saying that you're drinking too much. And she said immediately to him, what do you mean I'm you know, what evidence do you have of this? In other words, her protected activity of saying you would never say this to a man started in June of 2008. At that same meeting, they discussed the fact that this Jose uses some very outrageous conversation, outrageous language that I'm not going to repeat here, it's all in our papers, I'm sure you can see it. Her supervisor tells the appellant that she's supposed to remedy the situation of this guy using all of these sexual connotations at the workplace. And then he leaves. She complained about discrimination, gender discrimination, you know, you're not talking to all the other guys about drinking. And by the way, this particular supervisor, Casey admits in the record that he's a party animal. The lower court did not even allow us to define the particular narrow legal question this before the court today, right? How would you define it? I would define it as a once we get to February 24th. So what are we, I understand when you say protected activity, what are you saying? She shouldn't have been fired because that's what I'm asking you to tell me. I think you are saying she should not have been discharged. Are you saying that? She was discriminated against, retaliated against, and harassed. The basis so far as you're concerned, she should not have been discharged because? Because she complained. When she met with them on February 24th, they said to her, there's a rumor, this is her two supervisors telling her, there's a rumor you're sleeping around. She says, I want to talk to HR. That's a protected activity. I want to talk to Mr. Rothman. Ms. Eliota, I bet you can guess we're reasonably familiar with the the conduct, was it? What happened was she was told, let it drop. It's over. Right. Stop discussing it. And then something happened. And then she was discharged. Okay. But your honor. Don't you think we get to that? Well, yes, we absolutely do get to that. But she had a right under the opposition privilege of Title VII to find out who's saying these things about her. If someone tells you, you're sleeping around too much and there's a rumor, you just say, okay, I'm going to shut up. I'm going to chill my rights. I'm not going to, you know, we're going to decide this case on the record. You, you argue well, but we're going to decide on the record. And what the record shows is she was told, drop it. Don't discuss it further. And she did discuss it further. Now, isn't that what the record shows? That is what the record shows, but it is illegal to tell her to in all of the race cases that we have here and the sexual. When they told her to drop it, they had not discharged her. They left her on the payroll and said, you go ahead. You're still on the payroll, but don't discuss it further. Isn't that the accurate statement of what the record shows? I hate to disagree with you. Well, you just correct the facts. Don't worry. I'm not rumors about you sleeping around. I'm not going to drop it. No matter who tells me, I want to know who says it. And in this context, that Lucasfilm is totally discriminating that they didn't allow her to go to HR. Didn't allow her to go to Mr. Rothman, who was spreading the rumors. No, they didn't touch. She didn't know who was spreading. No, no. Mr. Rothman. The president was the person who had told her to supervisors. And if the trial court wouldn't let us depose Mr. Rothman on his activities, no disparate treatment, totally evidence not allowed in the lower court. And then she says she calls Mr. Bees. She's a very gentle person, Your Honor. So the way the papers portray her by the other side at certain points is despicable. And the recent letter that you received talking about how she has slept with two more men is not relevant at all to a hostile environment. I told you we're going to decide the case. And the papers are in. But Your Honor, you have to listen to me at least, right? Okay. I'm listening. You can guess I'm listening or I wouldn't raise the questions that I raise about what you're saying. Okay. But if you're told that you're sleeping around and you say, I want help. I want HR. I want Mr. Rothman, the president who's spreading the rumor. Okay. They don't tell her who said the rumor region originally. She didn't know. So when they say, let it alone, leave alone, go away. I'm sorry. You don't tell a woman she's sleeping around and then tell her, leave it alone, let it go. She was a total nervous wreck. Her panic attack started that day. And that's all of that is in the record. The next day she calls Mr. Bees. She says, talking about the business, she says, and by the way, did you have them? Yeah. She was much more gentler than I would have been, or then if it had been your daughter, you would have called Mr. Be yourself and said, what the heck are you saying about my daughter? I mean, you don't just sit around and take abuse, Your Honor. And that's what happened here. You don't chill a constitutional right. I think you want to tell us and you decide what you want to tell us. But what I think you want to tell us is not what happened, but why what happened was wrong. What happened by stopping her from going to HR or Mr. Rothman, and then by firing her for two reasons, calling Mr. Bees, which is a, which is a protected activity under this, this circuit city, this circuits cases. When she called him, she didn't know that he was a person she suspected. But when she asked, she was continuing opposition privilege. When she asked, he denied it. And he lied because he later testified, but he denied it. That's right. That's absolutely right. He denied it and he lied, but that's okay. All right. And the second thing she says to him is I'd have a hard time working with that was telling people I was sleeping around. And the third thing she says to him is I really apologize. Thank you so much for talking to me. Does that sound like somebody making a threat? There was never a threat. The threat is a disputed issue of fact that should have gone to a jury. So what they did wrong. Doesn't the record show Ms. Elioto that the person she was talking to, been talking to, and that's how they, they allege the threat. She decided who the company would work with. And the person on the phone was one of those persons that she had decided. Now is that what the record shows? No, Your Honor. I think the record would show if, if, um, if you read the EEOC Kaler case. Yes, I read it. Okay. I'm not reading notes. Okay. Well, I am. I'm a trial lawyer. It's an honor to be here in the appellate, federal appellate court, Your Honor. It's a big deal. It's an honor to have you, but it helps us if you talk about the record as the record shows. Well, we're going to decide the case on the record. Oh, no, no, no, Your Honor. All of the cases say that, that when the woman in the EEOC case got the letter about her job, that was a protected activity. She was investigating what the, um, the, the newer recent case, the Jew case, when she got a letter from a board member about whether or not she was performing perfectly, that was considered a protected activity. Those three cases, the Jew case, the Mary, um, the Hacienda case and the EEOC case are identical. That's exactly what Tabitha did. She called the guy and said, hey, you know, did you say this about me? I do not understand where this company gets the right to tell an employee that they cannot investigate a serious claim against the employee. That would be chilling the right to be able to enforce the ability to have a protected activity. Stopping her from HR, stopping her from Rothman and stopping her, um, and calling her call, the reason, which is the causal connection for termination was the call to bees, okay? Stopping her from doing three protected activities leaves her nowhere but terminated after four and a half years of hard work. Why? Because she was treated differently as a woman. Every one of these cases said being accused of sexual, um, promiscuity, that's subjective. Promiscuity is sexual harassment. Every one of the cases and the causal connection from the day that she was told that she was, uh, that she had called Mr. Bees, um, to the termination is literally three days. So, your honor, yes, what they did was wrong, uh, by denying her her right to properly, uh, be active in her protected activity. Number two, the lower court weighed evidence they should have never weighed. Then they weighed it in the favor of the defendant. And, and they, they say she was insubordinate. The lower court said she, that the lower court order was stunning. It said she was insubordinate of a concluded fact, which is not. It's a disputed issue of fact whether she was insubordinate. It says that she, uh, um, didn't have the slurs said at her. And so, if they're said in the room, um, it doesn't affect her. With all due respects, that's a total wrong reading of the law. I am, uh, you know, all I do is discrimination law. If you have someone walking around the room saying spick or nigger or anything, and you're sitting there listening to this all day long, it absolutely affects you. And every single case says it does. But the lower court ruled, no, it doesn't matter that this guy's walking around saying bitch and slut and all these other things, because he wasn't calling her it. That is a wrong reading of the law. And they applied the she threatened the defendant. That the threats are disputed issue of fact, a big disputed issue of fact. She said, I didn't threaten him at all. I merely said I would have a hard time working around, I, I, Tabitha, would have a hard time working around someone who indeed. Well, that's not precisely what she said. What she said was, if you did, I would have a hard time. I think that's disputed, Your Honor, with all due respects. What did she say? I believe she said I'd have a thought that of me. Oh, yes. She's having panic attacks since the day she was told this. I mean, from that day to her termination, I don't believe you can get more of a hostile work environment. She's wondering around who's talking about what she does sexually. And she's not allowed to go to the EEOC. Even the EDD said it was wrong. She should have been allowed to go to the, to HR and to obviously to Mr. Hoffman. Then the trial court denied us the ability to get discovery. It was fascinating. I get denied the ability to take the deposition of Mr. Hoffman and ask him what he, Hoffman, who's the terminating agent, the president, Mr. Hoffman, fired my client. He told her two supervisors to fire him from his talk with Don B's. There's no company, by the way, about Don B's other than the fact that Don B says it was confidential. That's not harm to the company. And there was no harm to the client's work ethic. She did everything she was supposed to do. You're going to probably want to rebut. Are you watching your time? Is that my time left? 154? Okay. I'll save those two minutes. But she, the lower court denied us the ability to even take the depositions for the disparate treatment causes of action. The harassment cause of action is, in my opinion, clear and the causal connection between retaliation. Three days later, she's retaliated. What was she to do? Not one write-up in four and a half years. Not one write-up. That's not insubordinate. You can't tell me I can't go, I can't go protect my constitutional rights in the United States of America. It's crazy. Thank you. Thank you. Good morning, Your Honor. Steve Hirsch for Lucasfilm Entertainment Company. I'm glad that this argument has brought us to a focus at last on the particular narrow questions, which appear to be whether calling Don Bees was a protected oppositional activity for purposes of the plaintiff's retaliation claim. More generally, the retaliation claim itself, the issue whether Judge Chesney improperly weighed evidence on a summary judgment, and finally, the denial of the discovery regarding Howard Roffman. So I'll try to turn to those as they arose. So first, the theory that calling Don Bees was a protected oppositional activity. First of all, I have to say that that is waived because it was not timely raised below. It was reviewed for abuse of discretion, and I hardly see any abuse there. Now, the fact is that Ms. Toda, as you noted, Judge Farris, didn't just ask Donald Bees any old question. She asked him the question that he was specifically, she was specifically, repeatedly, emphatically ordered not to ask him, namely, whether he was the person who had provided confidential information about her conduct to Lucasfilm. Now, Ms. Toda claims that she had some sort of a right to ask that question, a right that supposedly trumped two important interests of Lucasfilm, two important interests. What were they? First, an interest in getting feedback about the employee who represented the company around the world and whom they had no ability to monitor because she represented Lucasfilm in foreign countries. Second, an interest in maintaining a good relationship with a longtime trusted business partner, Donald Bees. Bees had a bid pending before Lucasfilm, and he was afraid that Toda would exercise influence against that bid if she learned that he was the informant, so he specifically asked Howard Rothman to keep his identity confidential, and Rothman agreed. By contrast, eight months earlier, when Casey Collins told Toda about Joni Honor's criticisms, he identified Honor as the source because Honor hadn't requested anonymity. Lucasfilm handled these two situations differently for sound business and argument that she had a right to confront outside business partners who complained about her conduct confidentially after she was specifically instructed not to do so. I think it's significant, it might be significant. She was doing an investigation. She didn't know who had done it. She finally assumed that she knew who did it, and she wanted to be assured, did he or did he not? But she had been told by the company, all right, let it drop, and she was still employed at that time, as I understand the record, wasn't she? Correct. She had not been discharged at that time. She had not been discharged. And to let it go, it's over. Correct. And that was direct instructions to her as an employee of the company. Correct. And the company then wanted, for reasons which arguably are business reasons, that the investigation cease. Yes. Isn't that what the record shows? That is what the record shows, and it shows even more than that. It shows that in the meeting in February of 2009, where she was apprised of the information that Mr. Bees had brought to Lucasfilm, she was told, look, this is a bump in the road. We know that this conduct that he's talking about actually relates to months ago. We already discussed it in a meeting last June, and we know you're working on that. So have no fear. Just don't go after the informant, please. And that's exactly what she did not have the restraint and judgment to do. She did go after the informant, even though she was not in danger at that time of being terminated. And in fact, Judge Chesney pointed out, and getting back to the question whether there's some right to do this, Judge Chesney pointed out in her reconsideration decision that the employee handbook confers no right of confrontation of this sort, and I know of no case or statute that does either, and I haven't seen Ms. Alioto's cite any. The fact is that after Toda confronted Don Bees, she sent her colleague Christina Anderson an email saying, I had a complete anxiety attack meltdown this morning. I'm fine now, but oh boy, not good. I'm so getting fired. That's at SER 168. She knew this wasn't just a small matter of asking someone an innocuous question or one that she had some right to ask. Now, more broadly, I'd like to talk about the retaliation claim, which now seems to be at the center of the case. As you've noted, the undisputed facts show that Toda was fired for insubordination that threatened the interests of her employer. And I think we should just, I just want to briefly mention what the elements of this claim are, because I think that's important. First, the plaintiff is supposed to raise a prima facie case by showing, one, involvement in a protected activity, two, an adverse employment action, and three, a causal link between the two. The defendant then has the burden to present legitimate reasons, excuse me, for the adverse action. The plaintiff must then demonstrate a genuine issue of material fact as to whether the reason advanced by the defendant was a mere pretext. So now, that brings us to what did Judge Chesney actually rule on this claim? She properly found, as a matter of law, that Toda could not prove a prima facie case, and that even if she could, Lucasfilm had articulated a legitimate reason for the warnings and termination. Now, Judge Chesney could have held that this claim was waived altogether, because Ms. Toda didn't say a word about it in her summary judgment opposition brief. She didn't lift a finger to defend her retaliation claim in that brief, and you can see that for yourself at SER 538 to 569. There was no argument, and there was no evidence. But Judge Chesney was charitable, and she dealt with this claim on its merits. She had the devil of a time figuring out what the protected activity was, because Toda's papers didn't say. But she concluded, after argument, that there must be two. One, Toda's complaint made of supposedly five-ish times about Jose Araujo's crew jokes, and two, her complaint in response to Joni Honors calling her an angry drunk, that if she were a man, this would be handled differently. And Judge Chesney held that Toda had submitted no evidence demonstrating the required causal link between those events and any adverse employment action. Now, on appeal, Toda doesn't challenge that causal link finding, and she thus concedes that it's correct, and so, in my view, retaliation is just out of the case. Judge Chesney also noted that at oral argument, Ms. Toda identified a third protected activity, namely her request to meet with human resources after being informed about the information supplied by Don Bees. But Judge Chesney noted that the record showed that Toda only sought that meeting to find out more about what the allegations were, not to complain about disparate treatment. And, in fact, Toda couldn't complain about disparate treatment, because, as I've just told you, she was assured that she was not going to be punished for what her supervisors regarded as old news. Now, on appeal, we have another redo. Toda now tries to revamp her retaliation claim by asserting that the protected opposition activity was confronting Don Bees, which she didn't timely raise below, and that theory is waived. And I believe I've discussed it adequately. Next, we come to the theory that Judge Chesney erred by improperly weighing evidence on summary judgment. Now, first off, I thought that this argument was abandoned, because I didn't see anything about it in Toda's reply brief to this court. But, assuming that it was not abandoned, Toda argues that the district court improperly weighed several pieces of evidence. One of those, and I kind of have to break them up a little bit, because they're very different One of those pieces of evidence was the allegation by Collins and Southern that Toda was reported to be sexually promiscuous, and Toda says that Judge Chesney should have considered that fact as part of Toda's hostile environment claim. The answer to that is that Toda didn't offer that fact in support of that claim. There was a section in her fact statement of her summary judgment opposition entitled, Toda is subjected to what could reasonably be perceived as harassment. And that section talks only about Araujo's jokes and Collins' comments, but not about this fact that's at SER 548. On the next page, the fact is raised, but it's not connected to her harassment claim or to any other claim, and I think you can hardly fault Judge Chesney for concluding that this fact was not one of the ones offered in support of the harassment claim. But even if this fact in the harassment context, as Toda claims she should have, we know it wouldn't have mattered to her, because later she denied Toda's reconsideration motion on this very issue, and here's what she wrote. There is no merit to Toda's argument, made for the first time by the way of the instant reconsideration motion, that a private conversation in which Toda's supervisors informed her of complaints concerning her conduct constituted an act of sexual harassment, and the authority cited by Toda for such proposition is clearly distinguishable. That's at SER 732. Now, I would submit that that decision reflects no abuse of discretion, and I also want to add that although I've seen a lot in the papers and perhaps heard just now about spreading rumors of promiscuity, there's zero, and I mean no, record evidence that Collins' supervisors ever spread rumors about her sexual conduct around the workplace. As Judge Chesney pointed out in this reconsideration motion that I, decision that I just quoted, this was a private conversation in which she was being counseled. Now, Ms. Toda also argues that Judge Chesney weighed three other pieces of evidence, all of which go to Toda's retaliation and disparate treatment claims. Toda faults Judge Chesney for, one, concluding that Toda threatened bees, excuse, yes, that Toda threatened bees, two, concluding that Toda's supervisors relied on that threat to justify firing her, and three, dismissing an admission by Casey Collins that he was a party animal. Now, in fact, there was no improper weighing as to any of this evidence. Judge Chesney explained in her reconsideration order that she made no finding that Toda threatened bees. Rather, she relied on uncontroverted testimony that bees told Rothman that he took Toda's statement as a threat, and the court went on to say that whether Toda actually threatened or intended to threaten bees was irrelevant. Finding that something is legally irrelevant is not the same thing as improperly weighing evidence. Courts are free to find evidence irrelevant on summary judgment. Moreover, the threat evidence went to pretext, and you don't even reach pretext until the plaintiff succeeds in making out a prima facie case or shows that she can at trial. But Judge Chesney held that she couldn't do that, so we don't even reach the issue of this threat evidence. Finally, as to Mr. Collins' party animal statement, the district court found it to be legally insufficient to prove that Collins was similarly situated to Toda for purposes of her disparate treatment claim because it didn't show that Collins, like Toda, drank so much that he missed work and was abusive to co-workers and so on. And so I think that's it for weighing. Finally, we have the Rothman discovery. This was intended to show that Howard Rothman was similarly situated to Toda for purposes of her disparate treatment claim, and it was founded on a scurrilous and completely unfounded assertion that Mr. Rothman possessed child pornography. This was pulled out of thin air. A magistrate denied this harassing and unnecessary discovery. No Rule 72A motion for relief was timely taken or taken at all, so that is completely waived. And Judge Chesney found that such discovery would have been irrelevant, and I think she couldn't be more right. And unless the Court has other questions, I'm happy to see the rest of my time. Thank you. We'll hear a rebuttal. The Court found that the discovery of Mr. Rothman was irrelevant, then why didn't they let us do it when it came to what we are saying, what the evidence clearly shows, as numerous books on all over the internet. We gave the Court all of that evidence to show the President does youth pornography. Our client gets accused of allegedly sleeping around and gets terminated because she wants to know who her accuser is, which is very un-American. So we were denied the right. You can argue this case any way you want, Ms. Eliola, because you have the time to do it, but she wasn't fired for sleeping around, was she? No, no, she was fired for investigating the... So when you say she was fired for sleeping around, maybe I misunderstood you. I thought you were saying she was fired for sleeping around and Rothman won't let us find out that he uses pornography, but she was... the question, I think, is whether they had a basis to find that she was not following instructions to the detriment of the company. Well, Your Honor, the Court has to admit that the seed of the issue here is this rumor of promiscuity. So in a disparate treatment cause of action, as one knows... Excuse me, what do you say the Court has to admit what? The seed of the controversy here is the accusation of being promiscuous, all right? So prior to termination, she has a right to find out if she's going to be... Does this record show that she was fired for being promiscuous? Is that what you're saying to us? No, Your Honor, I'm not. The record is clear that it shows... I thought you said the Court had to admit that this was all over. No, can I finish because... I know your time is running down. What? No, maybe I'm just not trying to get you to argue to the point on which this case is going to turn. Okay, thank you. I appreciate that. The call to bees was about the accusation, right? The call to bees was about the accusation. She was terminated for the call to bees and for allegedly, which is a disputed fact, a threatening bees. Those are the two reasons given throughout this case. She would not have bees at all had she not been accused of being promiscuous, which caused a hostile environment for her such that she was having panic attacks every day. Why'd they even tell her, Your Honor? Why'd they even tell her? Hey, there's a rumor you're sleeping around. There's a rumor you're sleeping around, but you don't get to go to HR, you don't get to go to Mr. Rothman, and you need to let it go. You don't get accused of something that serious and just let it go. My question is, is it not illegal for them to tell her she has no right to find out who's accusing her? So he says there's no evidence of them spreading this rumor. Not true. There's evidence of Anthony Daniels. There's evidence of Stacy. There's evidence of Rothman. There's evidence of many people passing this rumor around. There's also Mr. Casey walking by making fun of her saying, oh yeah, you don't sleep with men, making a joke about it when he knew she was having panic attacks and totally stressed out. So, Your Honor, I'll conclude by saying that the fact that she investigated, which is what the court just called it, and that there's a business rule of letting it go, would trump investigating a personal assault, in my opinion, would be an incorrect ruling of all of the cases that we have in our group, in our brief, which I know the court has read. But she was indeed investigating. She was indeed trying to vindicate her name, and as a consequence, a four-and-a-half-year, excellent, stellar performing employee got terminated summarily after she made the complaint and after she asked Mr. Bees if it was he, and it was based on sexual material. Thank you very much. The case just argued is submitted. Thank you.
judges: Farris, Noonan, Bybee